# In the United States Court of Federal Claims

### OFFICE OF SPECIAL MASTERS
### No. 17-0261V
### Filed: May 13, 2019
PUBLISHED

|  |  |
|---|---|
| JUDITH BRUEGGING,<br><br>            Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH<br>AND HUMAN SERVICES,<br><br>            Respondent. | Special Processing Unit (SPU);<br>Decision Awarding Damages; Pain<br>and Suffering; Influenza (Flu)<br>Vaccine; Shoulder Injury Related to<br>Vaccine Administration (SIRVA) |

*Amy A. Senerth, Muller Brazil, LLP, Dresher, PA, for petitioner.*
*Adriana Ruth Teitel, U.S. Department of Justice, Washington, DC, for respondent.*

## DECISION AWARDING DAMAGES[1]

**Dorsey**, Chief Special Master:

On February 23, 2017, Judith Bruegging ("petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*,[2] (the "Vaccine Act"). Petitioner alleges that she suffered a right shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine she received on October 3, 2015. Petition at 5. The case was assigned to the Special Processing Unit of the Office of Special Masters. For the reasons discussed below, the undersigned now finds that petitioner is entitled to compensation in the amount of **$91,163.89**.

---

[1] The undersigned intends to post this decision on the United States Court of Federal Claims' website. **This means the decision will be available to anyone with access to the Internet**. In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access. Because this published decision contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

## I.     Procedural History

Ms. Bruegging filed her petition for compensation on February 23, 2017, with four medical record exhibits and a Statement of Completion.  (ECF No. 1, 4, 8).  On October 13, 2017, respondent filed his report pursuant to Vaccine Rule 4(c) conceding that petitioner was entitled to compensation.  (ECF No. 15).  On October 16, 2017, the undersigned issued a ruling finding petitioner entitled to compensation.  (ECF No. 16).  A damages order was issued the same day.  (ECF No. 17).

On March 28, 2018, petitioner filed a status report stating that the parties "disagree[d] as to their respective damages assessment" and proposed filing simultaneous damages briefs within 30 days.  (ECF No. 25).  On April 17, 2018, a status conference was held and a schedule was set for the parties to file briefs on damages.  (ECF No. 27).  The parties have filed briefs discussing the damages issues in this case.  This case is now ripe for a determination regarding petitioner's pain and suffering and award of damages.

## II.     Factual History

On October 5, 2015, Ms. Bruegging (age 62) received a flu vaccine in her right shoulder (non-dominant arm) at Albers Medical Pharmacy in Kansas City, Missouri.  Petitioner's Exhibit ("Pet. Ex.") 1 at 2-4; Pet. Ex. 2 at 25.  Ms. Bruegging's medical history is significant for generalized osteoarthritis and anxiety in the records dating back to 2012.  Pet. Ex. 2 at 14-24.  Ms. Bruegging's medical history does not otherwise appear to be contributory to her claim in this case.

In her affidavit, Ms. Bruegging states that immediately after receiving the flu vaccination, she felt immediate pain in her right shoulder.  Pet. Ex. 10 at 1.  She stated that the next morning, she woke up with her "arm suspended out in mid air and had to the use my other arm to move it down.  The pain was extreme."  *Id*.

On October 20, 2015, Ms. Bruegging was seen at the office of her primary care physician for a complaint of possible bronchitis.  Pet. Ex. 2 at 12.  There was no mention of any shoulder symptoms during this appointment.

On October 27, 2015, Ms. Bruegging contacted Albers Pharmacy to report that she was experiencing shoulder pain from her flu vaccine.  Nurse Diane Weintraub noted that Ms. Bruegging was:

> experiencing 'excruciating' pain in her right arm, starting several hours post-injection.  Her hand goes numb, she has pain radiating down the front of her arm [and] tenderness at injection site.  She felt it got better over time to a tolerable level, but has resumed since getting sick last week.  It hurts only when arm not in use [and] is affecting her ability to sleep.  I advised her to take 800mg Ibuprofen … [and] to follow-up with your office.

Pet. Ex. 1 at 4.

On October 29, 2015, Ms. Bruegging presented to Stany D'Silva, MD, an orthopedist, for complaints of a painful and sore right shoulder.  Pet. Ex. 2 at 10.  Ms.

Bruegging reported that she received a flu vaccination 10 days prior[3] and started to notice soreness in her right arm.  *Id*.  She reported similar pain when she received the injection and was concerned that she was having a reaction to flu shot.  *Id*.  Ms. Bruegging reported that movement of the shoulder joint was painful, and she had difficulty sleeping at night.  *Id*.  A physical examination revealed localized tenderness around the acromioclavicular joint and restricted abduction.  *Id*.  The assessment was "[s]prain of unspecified acromioclavicular joint".  *Id*.  An x-ray was ordered and Ms. Bruegging received a steroid injection to treat her shoulder pain.  *Id*. at 10-11.  She was instructed to follow up in one week.  *Id*. at 11.

On October 30, 2015, Ms. Bruegging underwent an x-ray of her right shoulder. Pet. Ex. 2 at 35; Pet. Ex. 3 at 38.  No abnormalities were noted.

On November 5, 2015, Ms. Bruegging was seen for a one-week follow-up of her shoulder symptoms.  Pet. Ex. 3 at 39.  Dr. Christopher B. Geha, petitioner's primary care physician, noted that Ms. Bruegging was "much better from her shoulder situation…"  *Id*.  He also discussed her spinal stenosis problems and the need to consult with the neurosurgical team.  *Id*.

On January 11, 2016, Ms. Bruegging presented to Dr. Greg Van den Berge, an orthopedist, for complaints of right shoulder pain.  Pet. Ex. 2 at 50; Pet. Ex. 3 at 10. She reported symptoms of pain and stiffness of the right shoulder radiating down to her right elbow, and numbness in her right hand.  *Id*.  Ms. Bruegging reported that her pain started at the time she received a flu vaccination.  On examination, Ms. Bruegging demonstrated a decreased range of motion, joint pain, muscle pain and stiffness of the right shoulder.  Pet Ex. 2 at 52; Pet. Ex. 3 at 11-12.  She had slightly decreased strength and positive Neer and Hawkin's tests of her right shoulder.  *Id*.  Ms. Bruegging's previous x-rays from October 30, 2015 were re-examined and Dr. Van den Berge agreed that it demonstrated some degenerative changes at the acromioclavicular joint as well as early faint spurring at the glenohumeral joint.  She reported that the previous cortisone injection provided her with one week of relief before the pain returned to its previous level, and she declined another steroid injection.  Dr. Van de Berge stated "most of her symptoms appear to be coming from the rotator cuff.  It would be very unlikely that the influenza vaccine caused her rotator cuff pathology.  However, the rotator cuff does usually localize pain to the lateral aspect of the arm and the MRI will provide further information on specific pathology in her shoulder."  *Id*. at 52.  Dr. Van de Berge ordered an MRI study.  *Id*. at 53.  Ms. Bruegging expressed her concern that her right shoulder pain had been constant since she received the flu vaccine.  *Id*.  She was instructed to follow-up after her MRI study to discuss further treatment options.  *Id*. at 13.

Also on January 11, 2016, Ms. Bruegging contacted Nurse Weintraub at Albers Pharmacy to:

> report she had gotten a steroid shot in November and had seen the doctor 4 times.  She reports she still can't lay on her shoulder, has lost mobility and it hurts to drive or reach forward.  She had an x-ray which showed some arthritis.  She was calling to let me know she was seen an orthopedic surgeon today, Dr. Greg

---

[3] Petitioner actually received the vaccination 24 days prior to her October 29, 2015 appointment.

VandenBergh.  I asked her to follow up with me after her
appointment.

Pet. Ex. 1 at 5.

On January 13, 2016, Ms. Bruegging underwent an MRI of her right shoulder.
Pet Ex. 3 at 49.  The MRI showed moderate to severe isolated infraspinatus tendinitis
with an edema like signal from the myotendinous junction to the posterior greater
tuberosity footprint.  *Id.*  No underlying tear was noted.  *Id.*

On January 19, 2016, Ms. Bruegging was seen by Dr. Van den Berghe for
continued complaints of right shoulder pain and to review the results of her MRI.  Pet.
Ex. 3 at 30.  Dr. Van den Berghe recommended that petitioner try a short-term course of
oral NSAIDS (nonsteroidal anti-inflammatory drugs).  Ms. Bruegging refused any further
steroid injections and she did not wish to initiate any form of physical therapy.  *Id*. at 32.
She was instructed to follow up in four weeks if she had any persistent symptoms.  *Id*.

On May 24, 2016, Ms. Bruegging was seen at Carondelet Orthopedic Surgeons,
PA, for complaints of right shoulder pain.  Pet. Ex. 2 at 46.  Ms. Bruegging reported that
she had been taking Ibuprofen for the last three months and she was unable to stop
because of recurrent shoulder pain.  *Id*.  She reported being in "excruciating pain" and
experiencing arm weakness after a long drive to Chanute, Kansas.  *Id*.  On examination,
Ms. Bruegging had a reduced range of motion of her right shoulder, some muscle
weakness and positive Neer and Hawkin's testing.  *Id*. at 46.  Her left shoulder
examination was normal.  *Id*.  The assessment was osteoarthritis of the right shoulder,
right acromioclavicular degenerative joint disease, sprain of the right rotator cuff,
infraspinatus tendinitis, and impingement syndrome.  *Id*. at 47.  Ms. Bruegging received
another steroid injection to her right shoulder and was encouraged to begin formal
physical therapy.  *Id*.  She was instructed to follow up in six weeks.  *Id*.

On May 27, 2016, Ms. Bruegging underwent an initial shoulder evaluation at
Pinnacle Therapy Services.  Pet. Ex. 3 at 47.  She reported that she had received a "flu
shot high on [her] shoulder and it has hurt horribly since then."  *Id*.  Occupational
therapist Melanie Slocombe noted that Ms. Bruegging presented with complaints of
severe shoulder pain for six months and that she exhibited impaired right shoulder
range of motion and impaired right shoulder capsular mobility.  *Id*. at 48.  It was also
noted that petitioner's injury was limiting the functional use of her right upper extremity
with the activities of daily living.  *Id*.  There was also a concern for adhesive capsulitis.
It was recommended that Ms. Bruegging attend occupational therapy two to three times
weekly for the next six weeks.  *Id*.

Ms. Bruegging attended occupational therapy on June 1, 8, 10, 17, 22, 24, 29,
July 13, 20, 27, 2016.  Pet. Ex. 4.  During the June 29, 2016 session, Ms. Bruegging
reported that her right shoulder was getting better and that she could now wash and fix
her hair.  Pet. Ex. 3 at 8.  She also reported that she was sleeping better and driving,
although she continued to experience some pain while driving.  *Id*.  The assessment
noted that Ms. Bruegging was "progressing steadily with therapy with improving ROM
[range of motion] and decreasing c/o pain."  *Id*.  It was recommended that Ms.
Bruegging continue with therapy.  *Id*.

By August 3, 2016, Ms. Bruegging rated her pain level at 0-2 on "most days."
Pet. Ex. 4 at 2.  She noted that driving was improved, but she still experienced some

shoulder pain.  *Id.*  It was recommended that Ms. Bruegging continue with occupational therapy to further address her right shoulder strengthening and range of motion, but petitioner elected to discharge early secondary to her work schedule.  *Id.*  She was discharged with a home exercise program.  *Id*.

Ms. Bruegging was seen by Dr. Geha on September 26, 2016, for complaints of a cough.  Pet. Ex. 2 at 5.  Dr. Geha spoke with Ms. Bruegging about her right shoulder symptoms "which ha[ve] been an issue since her flu shot and we may need some more physical therapy to get improved range of motion.  We also talked about the stress of caring for her invalid mother."  *Id.*  Ms. Bruegging received a refill of her pain medication.  *Id*.

On October 19, 2016, Ms. Bruegging received a flu vaccination in her left arm (dominant).  Pet. Ex. 2 at 4, 24.

On October 23, 2016, Ms. Bruegging was seen at the Walgreens healthcare clinic for complaints of cough, nasal congestion and sore throat.  Pet. Ex. 2 at 41.  There is no mention of any shoulder complaints in this record.

## III.    Party Contentions

Petitioner seeks an award in the amount of $96,698.97, consisting of $95,000.00 as compensation for her pain and suffering, $1,319.89 for past unreimbursable medical expenses, and $379.08 for lost wages.  Petitioner's Brief in Support of Damages ("Pet. Brief") at 1 (ECF No. 30).

In support of her claim for damages, petitioner cites to a number of cases in which she argues that respondent "has routinely proffered damages in similar proffered SIRVA cases litigated by this firm."  Pet. Brief at 4-6.  She compares the facts in her case to those in five other decisions, *Hooper, Goldstein, Cimons, Stendal and Ponsness*[4] in which amounts from $80,000.00 to $100,000.00 were awarded based on the parties' joint stipulations or respondent's proffers on award of compensation.  *Id.*  When providing the details regarding her pain and suffering, petitioner relies heavily on the information provided in her affidavit.  Pet. Ex. 10.

Respondent argues that petitioner should be awarded $55,000.00 as compensation for her actual pain and suffering.  Respondent's Brief on Damages ("Res. Brief") at 1 (ECF No. 33).  He maintains that "[p]etitioner sustained a relatively minor

[4] *Hooper v. Sec'y Health & Human Servs.*, No. 16-355V, 2016 WL 5210853 (Fed. Cl. Spec. Mstr. June 23, 2016) (awarding $100,000.00 based on respondent's proffer on award of compensation); *Goldstein v. Sec'y Health & Human Servs.*, No. 15-963V, 2016 WL 2641768 (Fed. Cl. Spec. Mstr. Jan. 15, 2016) (awarding $100,000 based on respondent's proffer on award of compensation); *Cimons v. Sec'y Health & Human Servs.*, No. 16-380V, 2016 WL 6583729 (Fed. Cl. Spec. Mstr. Sept. 12, 2016) (awarding $91,721.28 based on the parties' joint stipulation awarding compensation); *Stendal v. Sec'y of Health & Human Servs.*, No. 15-969v, 2015 WL 10751215 (Fed. Cl. Spec. Mstr. Dec. 16, 2015) (awarding $80,000.00 based on respondent's award of compensation); *Ponsness v. Sec'y of Health & Human Servs.*, No. 15-826V, 2015 WL 10761228 (Fed. Cl. Spec. Mstr. Dec. 18, 2015) (awarding $95,000.00 based on respondent's proffer on award of compensation).

injury and received relatively little treatment." *Id.* at 7.  He argues that petitioner's medical records document under a year of shoulder complaints and treatment for her injury. *Id.*  Comparing petitioner's facts to those in *Desrosier, Dhanoa,* and *Marino*, respondent asserts "all three of these cases are factually distinguishable." *Id.*  Instead, he compares petitioner's injury to the one suffered by the petitioner in another case in which $60,000.00 was awarded for actual pain and suffering, *Knauss*,[5] claiming petitioner's injury "was less severe than what existed in *Knauss.*"  Res. Brief at 9.


## IV.     Discussion and Analysis

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an amount not to exceed $250,000."  § 15(a)(4).  Petitioner bears the burden of proof with respect to each element of compensation requested.  *Brewer v. Sec'y Health & Human Servs.*, No. 93-92V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).  Medical records are the most reliable evidence regarding a petitioner's medical condition and the effect it has on her daily life.  *Shapiro v. Sec'y Health & Human Servs.*, 101 Fed. Cl. 532, 537-38 (2011) ("[t]here is little doubt that the decisional law in the vaccine area favors medical records created contemporaneously with the events they describe over subsequent recollections.")

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress.  *See I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125 at *9 (Fed. Cl. Spec. Mstr. May 14, 2013), *originally issued* Apr. 19, 2013 ("*I.D.*") ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-172V, 1996 WL 300594 at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation").  Compensation awarded pursuant to the Vaccine Act shall include "actual and projected pain and suffering and emotional distress from the vaccine-related injury . . . not to exceed $250,000."  § 15(a)(4).  In determining an award for pain and suffering and emotional distress, it is appropriate to consider the severity of injury and awareness and duration of suffering.  *See I.D.*, 2013 WL 2448125 at *9-11(citing *McAllister v. Sec'y of Health & Human Servs.*, No. 91-1037V, 1993 WL 777030 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).  In

---

[5] *Desrosiers v. Sec'y Health & Human Servs.*, No. 16-224V, 2017 WL 5507804 (Fed. Cl. Spec. Mstr. Sept. 19, 2017) (awarding $85,000.00 for pain and suffering and $336.20 in past unreimbursable medical expenses); *Dhanoa v. Sec'y Health & Human Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018) (awarding $94,900.99 for pain and suffering and $862.15 in past unreimbursable medical expenses); *Marino v. Sec'y Health & Human Servs.*, No. 16-622V, 2018 WL 2224736 (Fed. Cl. Spec. Mstr. Mar. 26, 2018) (awarding $75,000.00 for pain and suffering and $88.88 in unreimbursable medical expenses); *Knauss v. Sec'y Health & Human Servs.*, No. 16-1372V, 2018 WL 3432906 (Fed. Cl. Spec. Mstr. May 23, 2018) (awarding $60,000.00 for pain and suffering and $170.00 in unreimbursable medical expenses).

evaluating these factors, the undersigned has reviewed the entire record, including medical records and affidavits submitted by petitioner and others.

The undersigned may also look to prior pain and suffering awards to aid in her resolution of the appropriate amount of compensation for pain and suffering this case. *See, e.g., Jane Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, the undersigned also may rely on her own experience adjudicating similar claims. *See Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, it must be stressed that pain and suffering is not determined based on a continuum. *See Graves v. Sec'y of Health & Human Servs.*, 109 Fed. Cl. 579 (2013).

In *Graves*, the Court rejected the special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. The Court noted that this constituted "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Graves*, 109 Fed. Cl. At 590. Instead, the Court assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id*. at 595.

## A. History of SIRVA Settlement and Proffer

SIRVA cases have an extensive history of informal resolution within the SPU. As of January 1, 2019, 1,023 SIRVA cases have informally resolved[6] within the Special Processing Unit since its inception in July of 2014. Of those cases, 602 resolved via the government's proffer on award of compensation, following a prior ruling that petitioner is entitled to compensation.[7] Additionally, 395 SPU SIRVA cases resolved via stipulated agreement of the parties without a prior ruling on entitlement.

Among the SPU SIRVA cases resolved via government proffer, awards have typically ranged from $77,000.00 to $125,000.00.[8] The median award is $100,000.00.

---

[6] Additionally, 31 claims alleging SIRVA have been dismissed within the SPU.

[7] Additionally, there have been 16 prior cases in which petitioner was found to be entitled to compensation, but where damages were resolved via a stipulated agreement by the parties rather than government proffer.

[8] Typical range refers to cases within the second and third quartiles. Additional outlier awards also exist. The full range of awards spans from $25,000.00 to $1,845,047.00. Among the 16 SPU SIRVA cases resolved via stipulation following a finding of entitlement, awards range from $45,000.00 to $1,500,000.00 with a median award of $122,886.42. For these awards, the second and third quartiles range from $90,000.00 to $160,502.39.

In most instances, these awards are presented by the parties as a total agreed upon dollar figure without separately listed amounts for expenses, lost wages, or pain and suffering.

Among SPU SIRVA cases resolved via stipulation, awards have typically ranged from $50,000.00 to $95,000.00.[9]  The median award is $70,000.00.  As with proffered cases, in most instances, stipulated awards are presented by the parties as a total agreed upon dollar figure without separately listed amounts for expenses, lost wages, or pain and suffering.  Unlike the proffered awards, which purportedly represent full compensation for all of petitioner's damages, stipulated awards also typically represent some degree of litigative risk negotiated by the parties.

## B.  Prior Decisions Addressing SIRVA Damages

In addition to the extensive history of informal resolution, the undersigned has also issued 14 reasoned decisions as of the end of March of 2019 addressing the appropriate amount of compensation in prior SIRVA cases within the SPU.[10]

### i.      Below-median awards limited to past pain and suffering

In six prior SPU cases, the undersigned has awarded compensation for pain and suffering limited to compensation for actual or past pain and suffering that has fallen below the amount of the median proffer discussed above.  These awards ranged from $60,000.00 to $85,000.00.[11]  These cases have all included injuries with a "good"

---

[9] Typical range refers to cases within the second and third quartiles.  Additional outlier awards also exist.  The full range of awards spans from $5,000.00 to $509,552.31.  Additionally, two stipulated awards were limited to annuities, the exact amounts of which were not determined at the time of judgment.

[10] An additional case, *Young v. Sec'y Health & Human Servs.*, No. 15-1241, was removed from the SPU due to the protracted nature of the damages phase of that case.  In that case the undersigned awarded $100,000.00 in compensation for past pain and suffering and $2,293.15 for past unreimbursable expenses. 2019 WL 664495 (Fed. Cl. Spec. Mstr. Jan. 22, 2019).  A separate reasoned ruling addressed the amount awarded. 2019 WL 396981 (Fed. Cl. Spec. Mstr. Jan. 4, 2019).

[11] These cases are:  *Knauss v. Sec'y Health & Human Servs.*, No. 16-1372V, 2018 WL 3432906 (Fed. Cl. Spec. Mstr. May 23, 2018) (awarding $60,000.00 for pain and suffering and $170.00 in unreimbursable medical expenses); *Marino v. Sec'y Health & Human Servs.*, No. 16-622V, 2018 WL 2224736 (Fed. Cl. Spec. Mstr. Mar. 26, 2018) (awarding $75,000.00 for pain and suffering and $88.88 in unreimbursable medical expenses); *Attig v. Sec'y Health & Human Servs.,* No. 17-1029, 2019 WL 1749405 (Fed. Cl. Spec. Mstr. Feb. 19, 2019)(awarding $75,000.00 for pain and suffering and $1,386.97 in unreimbursable medical expenses); *Kim v. Sec'y Health & Human Servs.*, No. 17-418V, 2018 WL 3991022 (Fed. Cl. Spec. Mstr. July 20, 2018) (awarding $75,000.00 for pain and suffering and $520.00 in unreimbursable medical expenses); *Desrosiers v. Sec'y Health & Human Servs.*, No. 16-224V, 2017 WL 5507804 (Fed. Cl. Spec. Mstr. Sept. 19, 2017) (awarding $85,000.00 for pain and suffering and $336.20 in past unreimbursable medical expenses); *Dirksen v. Sec'y Health & Human Servs.*, No. 16-1461V, 2018 WL 6293201 (Fed. Cl. Spec. Mstr. Oct. 18, 2018) (awarding $85,000.00 for pain and suffering and $1,784.56 in unreimbursable medical expenses).

prognosis, albeit in some instances with some residual pain.  All of these cases had only mild to moderate limitations in range of motion and MRI imaging likewise showed only evidence of mild to moderate pathologies such as tendinosis, bursitis or edema.  The duration of injury ranged from seven to 21 months and, on average, these petitioners saw between 11 and 12 months of pain.

Significant pain was reported in these cases for up to eight months.  However, in most cases, these petitioners subjectively rated their pain as six or below on a ten-point scale.  Only the petitioners in *Kim* and *Attig* reported pain at the upper end of the ten-point scale.  Most of these petitioners pursued physical therapy for two months or less and none had any surgery.  Only two (*Attig* and *Marino*) had cortisone injections.  Several of these cases (*Knauss*, *Marino*, *Kim*, and *Dirksen*) delayed in seeking treatment.  These delays ranged from about 42 days in *Kim* to over six months in *Marino*.

Two of the petitioners (*Marino* and *Desrosiers*) had significant lifestyle factors that contributed to their awards.  In *Marino*, petitioner presented evidence that her SIRVA prevented her from her avid tennis hobby.  In *Desrosiers*, petitioner presented evidence that her pregnancy and childbirth prevented her from immediately seeking full treatment of her injury.

### ii.    Above-median awards limited to past pain and suffering

Additionally, in five prior SPU cases, the undersigned has awarded compensation limited to past pain and suffering falling above the median proffered SIRVA award.  These awards have ranged from $110,000.00 to $160,000.00.[12]  Like those in the preceding group, prognosis was "good."  However, as compared to those petitioners receiving a below-median award, these cases were characterized either by a longer duration of injury or by the need for surgical repair.  Four out of five underwent some form of shoulder surgery while the fifth (*Cooper*) experienced two full years of pain and suffering, eight months of which were considered significant, while seeking extended conservative treatment.  On the whole, MRI imaging in these cases also showed more significant findings.  In four out of five cases, MRI imaging showed possible evidence of partial tearing.[13]  No MRI study was performed in the *Cooper* case.

---

[12] These cases are: *Cooper v. Sec'y Health & Human Servs.*, No. 16-1387V, 2018 WL 6288181 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding $110,000.00 for pain and suffering and $3,642.33 in unreimbursable medical expenses); *Knudson v. Sec'y Health & Human Servs.*, No. 17-1004V, 2018 WL 6293381 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding $110,000.00 for pain and suffering and $305.07 in unreimbursable medical expenses); *Collado v. Sec'y Health & Human Servs.*, No. 17-225V, 2018 WL 3433352 (Fed. Cl. Spec. Mstr. June 6, 2018) (awarding $120,000.00 for pain and suffering and $772.53 in unreimbursable medical expenses); *Dobbins v. Sec'y Health & Human Servs.*, No. 16-0854V, 2018 WL 4611267 (Fed. Cl. Spec. Mstr. Aug. 15, 2018) (awarding $125,000.00 for pain and suffering and $3,143.80 in unreimbursable medical expenses); *Reed v. Sec'y of Health & Human Servs.*, No. 16-1670V, 2019 WL 1222925 (Fed. Cl. Spec. Mstr. Feb. 1, 2019) (awarding $160,000.00 for pain and suffering and $4,931.06 in unreimbursable medical expenses).

[13] In *Reed*, MRI showed edema in the infraspinatus tendon of the right shoulder with a possible tendon tear and a small bone bruise of the posterior humeral head.  In *Dobbins*, MRI showed a full-thickness partial tear of the supraspinatus tendon extending to the bursal surface, bursal surface fraying and partial

During treatment, each of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and all experienced moderate to severe limitations in range of motion.  Moreover, these petitioners tended to seek treatment of their injuries more immediately.  Time to first treatment ranged from five days to 43 days.  Duration of physical therapy ranged from one to 24 months and three out of the five had cortisone injections.

### iii.   Awards including compensation for both past and future pain and suffering

In three prior SPU SIRVA cases, the undersigned has awarded compensation for both past and future pain and suffering.[14]  In two of those cases (*Hooper* and *Binette*), petitioners experienced moderate to severe limitations in range of motion and moderate to severe pain.  The *Hooper* petitioner underwent surgery while in *Binette,* petitioner was deemed not a candidate for surgery following an arthrogram.  Despite significant physical therapy (and surgery in *Hooper*), medical opinion indicated that their disability would be permanent.  In these two cases, petitioners were awarded above-median awards for actual pain and suffering as well as awards for projected pain and suffering for the duration of their life expectancies.  In the third case (*Dhanoa*), petitioner's injury was less severe than in *Hooper* or *Binette*; however, petitioner had been actively treating just prior to the case becoming ripe for decision and her medical records reflected that she was still symptomatic despite a good prognosis.  The undersigned awarded an amount below-median for actual pain and suffering, but, in light of the facts and circumstances of the case, also awarded one-year of projected pain and suffering.

## C. Determining Petitioner's Award of Pain and Suffering in This Case

In the experience of the undersigned, awareness of suffering is not typically a disputed issue in cases involving SIRVA.  In this case, neither party has raised, nor is the undersigned aware of, any issue concerning petitioner's awareness of suffering and the undersigned finds that this matter is not in dispute.  Thus, based on the

---

thickness tear of the tendon, tear of the posterior aspects of the inferior glen humeral ligament, and moderate sized joint effusion with synovitis and possible small loose bodies.  In *Collado*, MRI showed a partial bursal surface tear of the infraspinatus and of the supraspinatus.  In *Knudson*, MRI showed mild longitudinally oriented partial-thickness tear of the infraspinatus tendon, mild supraspinatus and infraspinatus tendinopathy, small subcortical cysts and mild subcortical bone marrow edema over the posterior-superior-lateral aspect of the humeral head adjacent to the infraspinatus tendon insertion site, and minimal subacromial-subdeltoid bursitis.

[14] These cases are: *Dhanoa v. Sec'y Health & Human Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018) (awarding $85,000.00 for actual pain and suffering, $10,000.00 for projected pain and suffering for one year, and $862.15 in past unreimbursable medical expenses); *Binette v. Sec'y Health & Human Servs.*, No. 16-731V, 2019 WL 1552620 (Fed. Cl. Spec. Mstr. Mar. 20, 2019) (awarding $130,000.00 for actual pain and suffering, $1,000.00 per year for a life expectancy of 57 years for projected pain and suffering, and $7,101.98 for past unreimbursable medical expenses); and *Hooper v. Sec'y Health & Human Servs.*, No. 17-12V, 2019 WL 1561519 (Fed. Cl. Spec. Mstr. Mar. 20, 2019) (awarding $185,000.00 for actual pain and suffering, $1,500.00 per year for a life expectancy of 30 years for projected pain and suffering, $37,921.48 for lost wages).

circumstances of this case, the undersigned determines that petitioner had full awareness of her suffering.

### a. Severity and Duration of the Injury

#### i. Affidavit Testimony

With respect to the severity of petitioner's injury, Ms. Bruegging's affidavit provides a description of the pain throughout the duration of her injury. Pet. Ex. 10. Ms. Bruegging stated that the first year of "chronic extreme pain from my right shoulder [was] indescribable." *Id*. at 1. She stated that she was unable to dress herself, wash her hair, drive or lift objects and she would cry from the pain. Ms. Bruegging stated that she took four Ibuprofen pills three times a day for "months on end." She stated that she cut her hair because putting her hair up became too painful.

Regarding her current condition, Ms. Bruegging stated that while her right shoulder pain improved after attending occupational therapy, the pain is not gone. Pet. Ex. 10 at 2. She must do her home exercises so that her shoulder does not become frozen. *Id*. Ms. Bruegging no longer attempts any physical activities that involve the overuse of her arm or shoulder. She stated that although she was not an avid golfer or skier, she did engage in these activities periodically. As a result of her shoulder injury, Ms. Bruegging no longer attempts any of these activities. She also has difficulty cleaning her home and doing household chores. Id. at 2-3.

Ms. Bruegging works as a Pharmacy Benefits Manager and she spends a lot of time on the computer which irritates her shoulder. Pet. Ex. 10 at 2-3. She stated that she has learned to take more frequent or longer breaks to relieve the aching in her shoulder. *Id*.

Ms. Bruegging was also caring for her mother during the time she was experiencing the most severe shoulder pain. She described how she had to rely on friends to assist her with her mother (i.e., helping her mother in and of the car, into the shower). She was limited in her ability to attend occupational therapy due to her schedule in caring for her mother and her work schedule. Ms. Bruegging's mother died in 2017. *See* Scheduling Order dated April 3, 2017 (ECF No. 10).

Ms. Bruegging filed an affidavit from her youngest son, Rory McGilley. Pet. Ex. 9. Mr. McGilley stated that he frequently observed his mother holding her right arm and having difficulty sleeping because of the pain. *Id*. at 1. He recalled that his mother had difficulty raising her arm, driving and caring for his grandmother. *Id*.

Ms. Bruegging also filed an affidavit from her friend, Susann Lee Riffe, as petitioner's exhibit 6. Ms. Riffe stated that she has known Ms. Bruegging for over 35 years as a good friend. She stated that prior to the vaccination, Ms. Bruegging had no issues with the right shoulder. After vaccination, Ms. Riffe stated that there were occasions where she would assist Ms. Bruegging or her mother because of petitioner's shoulder injury. Ms. Riffe recalled bringing prepared food to Ms. Bruegging because

cooking became difficult for petitioner and Ms. Riffe frequently ran errands so Ms. Bruegging did not have to drive.

### ii.  Medical Record Evidence

The undersigned acknowledges and finds that Ms. Bruegging suffered severe shoulder pain from the time she received the flu vaccination at issue on October 5, 2015 to November 5, 2015, where it was documented that Ms. Bruegging was "much better from her shoulder situation" – a one-month period.  She first sought treatment approximately 24 days after her vaccination.  Pet. Ex. 2 at 2.  At that time, she demonstrated localized tenderness around the acromioclavicular joint and restricted abduction.  Pet. Ex. 2 at 10.  Her pain was severe enough that she received a cortisone injection at that time (although no pain level rating was provided).

Ms. Bruegging next sought treatment for her shoulder two months later when she reported pain and stiffness of her right shoulder.  Pet. Ex. 2 at 50.  At this appointment, she reported that she only received one week of relief from her cortisone injection before the pain returned to its previous levels.  *Id*.  She declined another steroid injection and instead opted to undergo an MRI which showed moderate to severe isolated infraspinatus tendinitis, although no underlying tear was noted.  Pet. Ex. 3 at 49.  At this point, Ms. Bruegging had experienced approximately three and a half months of severe pain, with a one-week period of relief due to the cortisone injection.  However, during an appointment with her orthopedist on January 19, 2016, Ms. Bruegging refused another cortisone injection and she did not wish to initiate physical therapy and instead opted to treat her symptoms with NSAIDs.  Pet. Ex. 3 at 30.

Over the next three months, Ms. Bruegging treated her symptoms with NSAIDs until a long drive exacerbated her shoulder symptoms.  Pet. Ex. 2 at 46.  At this point, on May 24, 2016, Ms. Bruegging opted for a second steroid injection and she agreed to attend formal physical therapy due to the severe pain.  *Id*.  Ms. Bruegging attended physical therapy from early June 2016 until August 3, 2016.  At her first appointment, Ms. Bruegging stated that her pain could reach a level of 10/10, with her pain ranging from an 8 and decreasing to a 0-2 over the next two months.  Pet. Ex. 4 at 26.  By her August 3, 2016 appointment, Ms. Bruegging rated her pain as 0-2 on "most days."  Pet. Ex. 4 at 2.  There are no further documented symptoms or treatment for petitioner's shoulder in the medical records after this date.

### b.  Pain and Suffering

In total, petitioner experienced approximately ten months of documented pain and suffering.  Ms. Bruegging's severe level of shoulder pain improved after only a month, however, this improvement seems to have been caused by one-week relief in her symptoms due to the cortisone injection she received.  Her pain returned to a severe level and maintained this severe level for the next six to eight months.  Ms. Bruegging's MRI demonstrated a moderate to severe tendinitis.  In her affidavit, Ms. Bruegging described additional ongoing sequela, including an ongoing impact on her personal and work life, but these reports are not fully reflected in her medical records.

Ms. Bruegging's symptoms seem to have mostly subsided after ten months as demonstrated by her August 3, 2016 physical therapy record.

The above-described course of petitioner's condition is very similar to the prior *Kim*, *Marino*, and *Attig* cases, all of which were awarded damages below the median award for proffered SIRVA cases.  In those cases, petitioners experienced from seven to 15 total months of pain and suffering.  However, unlike this case, the *Kim* and *Attig* petitioners reported only one to three months of significant pain and all four cases included MRI findings consistent with a milder type injury.  Ms. Bruegging experienced six to eight months of severe pain and her MRI demonstrated a more severe type of injury.  This distinction provides preponderant evidence that she experienced a more severe injury than the above petitioners.

In light of all of the above, and based on the record as a whole, the undersigned finds that $90,000.00 in compensation for past pain and suffering is reasonable and appropriate in this case.

### D.  Award for Past Unreimbursed Expenses

Ms. Bruegging requests $1,319.89 in past unreimbursable expenses.  Pet. Brief at 1; Pet. Ex. 6.  In his brief, respondent rightfully notes that petitioner has only provided supporting documentation for $1,163.80 of these expenses.  Resp. Brief at 4-5, 10.  Thus, petitioner is awarded $1,163.80 for her past unreimbursable expenses.

### E.  Lost Wages

Ms. Bruegging requests $379.08 for lost wages.  Pet. Brief. at 1.  In support of this claim for lost wages, she filed a letter from the human resources manager of her employer, MedTrakRX, who states that Ms. Bruegging:

> did not have sufficient paid time off (PTO) available and was
> subject to unpaid time per company policy.  Instead, MedTrakRX
> allowed Ms. Bruegging a flexible schedule to accommodate various
> obligations.  Ms. Bruegging opted to work this flexible schedule. We
> do not track exempt employees time away from work and will
> assume the time submitted by Ms. Bruegging is accurate.

Pet. Ex. 7 at 1.  Petitioner also provided paystubs and other documentation showing the time taken as paid time off (PTO).  However, these documents do not provide evidence of unpaid time.  Without sufficient evidence demonstrating that petitioner had any unpaid leave or reductions in salary, an award for lost wages cannot be made.  Thus, petitioner's claim for lost wages is denied.

### F.  Amount of the Award

In determining an award in this case, the undersigned does not rely on a single decision or case.  Rather, the undersigned has reviewed the particular facts and

circumstances in this case, giving due consideration to the circumstances and damages in other cases cited by the parties and other relevant cases, as well as her knowledge and experience adjudicating similar cases.  For all the reasons discussed above, the undersigned finds that $90,000.00 represents a fair and appropriate amount of compensation for petitioner's past pain and suffering.  In addition, the undersigned finds that petitioner is entitled to compensation for $1,163.89 for her past unreimbursed medical expenses.  No award is made for lost wages.

## V.     Conclusion

In light of all of the above, the undersigned awards **petitioner a lump sum payment of $91,163.89,** (representing $90,000.00 for petitioner's past pain and suffering and $1,163.89 for unreimbursable medical expenses) **in the form of a check payable to petitioner, Judith Bruegging.** This amount represents compensation for all damages that would be available under 42 U.S.C. § 300aa-15(a).  *Id.*

The clerk of the court is directed to enter judgment in accordance with this decision.[15]

**IT IS SO ORDERED.**

**s/Nora Beth Dorsey**
Nora Beth Dorsey
Chief Special Master

---

[15] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.